Eric Rosen (*pro hac vice forthcoming*)
Constantine P. Economides (*pro hac vice forthcoming*)
Brianna K. Pierce (CA Bar No. 336906)
**DYNAMIS LLP**
100 Bayview Circle
Newport Beach, CA 92660
Tel: (617) 802-9157
Email: erosen@dynamisllp.com
        ceconomides@dynamisllp.com
        bpierce@dynamisllp.com

Aaron M. Katz (*pro hac vice forthcoming*)
**Aaron Katz Law LLC**
399 Boylston Street, 6th Floor
Boston, MA 02116
Tel: (617) 915-6350
Email: akatz@aaronkatzlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| HECTOR RODRIGUEZ, SETH ABNER, and HECZ, LLC, | CASE NO.: |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| ACTIVISION BLIZZARD, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiffs Hector Rodriguez, Seth Abner, and HECZ, LLC (collectively, "Plaintiffs") bring this complaint for damages and injunctive relief against Defendant Activision Blizzard, Inc. ("Defendant" or "Activision") for violations of Section 1 and 2 of the Sherman Act; Section 16720 of the California Business and Professions Code (the "Cartwright Act"); Section 17200 *et seq.* of the California Business and Professions Code (the "UCL");  and, Sections 3(2) and 3(3) of the Illinois Antitrust Act, 740 ILCS 10.

**NATURE OF ACTION**

1. This action arises from Activision's unlawful 100% monopoly over—and agreements unlawfully restraining trade with respect to—professional Call of Duty leagues and tournaments. As a result of its myriad anticompetitive actions, Activision now holds an unlawful 100% monopoly over that lucrative and once-vibrant market. Activision has used that unlawful monopoly power to prevent would-be competitors from entering the market, as well as to coerce the market's other participants—in particular, professional Call of Duty players and team owners—to acquiesce to extortionate financial terms. Absent its unlawful monopoly, Activision could never have obtained those terms, which enrich Activision at the team owners' and players' expense without any pro-competitive justification. Prospective team owners and players who were unwilling or unable to acquiesce to those terms were effectively frozen out of the market (i.e., were forced to forego participating in the relevant market altogether), while other prospective team owners and players (including Rodriguez and Abner) were forced to incur additional (and foreseeable) economic burdens in order to satisfy Activision's anti-competitive terms.

2. The Department of Justice recently concluded that, with respect to the professional Call of Duty market, Activision engaged in *per se* violations of Section 1 of the Sherman Act that were intended to and did inflict economic injury on professional Call of Duty players such as plaintiff Seth Abner. *See United States v. Activision Blizzard, Inc.*, No. 23-cv-00895 (D.D.C.) (the "DOJ Action"), ECF No. 1 (complaint); *see also id.*, DOJ Action, ECF No. 5 (competitive impact statement), at 1 (stating that Activision's illegal conduct "suppressed esports players' wages").

3. This lawsuit seeks civil damages arising from the Section 1 violations that the Department of Justice found, as well as from additional Section 1 and Section 2 violations and violations of the Cartwright Act and Illinois Antitrust Act that were not within the scope of the Department of Justice's investigation and enforcement action.

4. Activision is the creator and owner of the iconic video game franchise Call of Duty. Call of Duty is the best-selling first-person-shooter video game franchise in history and the most successful game franchise of any type created in the United States. Call of Duty's hyper-realistic

graphics, military combat storylines, complex strategies and tactics, and team-based multi-player gameplay that allows teams to compete head-to-head on the "battlefield" have made the franchise an entertainment phenomenon. The Call of Duty franchise, which includes 22 game titles to date, has propelled Activision to annual revenues of nearly $10 billion, a market capitalization of over $70 billion, and a merger with Microsoft worth $69 billion.

5.     Call of Duty's fans do not just love playing the game. They also love watching the world's best players compete against each other. Since at least 2005, the world's best Call of Duty players have competed against each other professionally in organized leagues and tournaments that Call of Duty fans passionately follow. Hundreds of millions of loyal Call of Duty fans have watched these professional Call of Duty competitions on television and streaming internet channels hosted by Twitch and YouTube, and millions have filled arenas and stadiums to watch the competitions in person. The most popular professional Call of Duty players, such as plaintiff Seth Abner (a/k/a "Scump")—the second winningest player in professional Call of Duty history with 30 major championships wins—have obtained almost rock-star status. And the most successful professional Call of Duty teams—such as plaintiff Hector Rodriguez's (better known as "H3CZ") legendary "OpTic" team—have earned tens of millions of dollars in endorsement and sponsorship deals, trademarked merchandise sales, streaming revenue, and prize money. Professional Call of Duty is, essentially, the "esport" equivalent of professional football.

6.     At least until 2019, professional Call of Duty was a vibrant, competitive product market. There were multiple different professional leagues and tournaments that provided lucrative prize pools and garnered substantial viewership. These leagues and tournaments were organized and conducted by a variety of different entities, including Activision, GameStop, and Major League Gaming. These leagues and tournaments competed with each other to provide the best overall experience for the players, teams, and fans—in terms of both entertainment quality and commercial success. The leagues and tournaments were "open" and had modest entry fees, which ensured that the best players and teams were able to participate in them. Participating and succeeding in the leagues and tournaments enabled the best players and teams to gain and solidify their fan bases and

1    generate the commercial revenue—through sponsorships, endorsements, and social media

2    viewership—that flows from such popularity.

3        7.    In late 2019, however, Activision took concerted and purposeful actions: (i) to obtain

4    and perpetuate a 100% monopoly over the professional Call of Duty market, in violation of Section

5    2 of the Sherman Act; and (ii) to wield that unlawful monopoly power to economically coerce the

6    world's top players and teams to agree to Activision's rent-seeking demands and various trade-

7    restraining contractual provisions that constitute *per se* violations of Section 1 of the Sherman Act.

8    Those who could not acquiesce to Activision's extortionate terms were excluded from the market

9    or, in a few instances, allowed to participate in the market only if they "partnered" with investors

10   who satisfied Activision's preferences. Activision's actions were intended to, and did, eliminate *all*

11   professional Call of Duty leagues and professional Call of Duty tournaments other than the

12   Activision Call of Duty League (the "Activision CoD League"), which Activision owns and

13   controls.

14       8.    The Activision CoD League is a closed league that Activision capped at twelve

15   permanent teams, with each team connected to a city. In this regard, Activision modeled the

16   Activision CoD League after traditional sports leagues such as the National Football League,

17   National Basketball Association, and Major League Baseball. Unlike traditional sports leagues,

18   however, the Activision CoD League was not the result of a collective bargaining agreement

19   between team owners and players. Activision imposed the model on prospective team owners and

20   players. Indeed, players, including plaintiff Seth Abner, were forced to agree to lengthy, Activision-

21   drafted "Official Rules, Terms and Conditions" of the Call of Duty League (the "Rules")—while at

22   a photoshoot, without adequate time to review, despite requesting counsel, and under threat of being

23   excluded from the Activision CoD League absent immediate acquiescence to its terms. The Rules,

24   together with a previously signed "Player Professional Services Agreement" and an Activision-

25   imposed "Streaming Policy," significantly and onerously restricted players' abilities to earn

26   compensation from other sources besides Activision.

27

28

9.      As another critical distinction between the Activision CoD League and traditional sports leagues, Activision's copyright over the Call of Duty game provides Activision control over the essential facility of any professional Call of Duty competition—the game itself. Activision's copyright and trademark over the Call of Duty video games enabled Activision to swiftly monopolize the "downstream" professional Call of Duty market—a course of conduct that legal experts have described as conceptually similar to an unlawful tying arrangement (i.e., Activision used its monopoly over the Call of Duty video games' intellectual property to acquire an unlawful monopoly in the separate market of professional Call of Duty competitions). Activision intended to, and did, exploit that unlawful monopoly power to Activision's economic benefit and to the economic detriment of the world's top players and teams.

10.      Activision announced the formation of the Activision CoD League in 2019. But Activision began laying the seeds for its unlawful monopolization in 2016. At that time, Major League Gaming Corporation was the leading organizer of professional Call of Duty competitions, and Activision acquired that competitor. That acquisition was not subject to the Hart-Scott-Rodino Act's pre-merger notification requirements, and Activision did not voluntarily submit the transaction to the Federal Trade Commission ("FTC") for review. Activision thus completed its acquisition of Major League Gaming—thereby eliminating Activision's most significant competitive threat in the professional Call of Duty market—without any FTC approval.

11.      Shortly after completing the Major League Gaming acquisition, Activision announced that it was forming a professional league for a new Activision game called Overwatch, a first-person fantasy game based around futuristic, cartoonish superhero characters. Unlike all other professional video game leagues and tournaments to date, Activision's Overwatch league would be a "closed" league. Activision capped the league at 12 teams, selling each of the 12 team "slots" for $20 million. Because Overwatch was a substantially less popular game than Call of Duty, particularly amongst United States consumers, Activision viewed its new Overwatch league as a low-risk way to test whether Activision could reap substantial revenue from a closed-league

1  requiring teams to pony up massive entry fees. If the newfangled Overwatch league was a failure, it

2  would not taint the goodwill of Activision's far more important Call of Duty franchise.

3      12.    As portrayed by Activision to investors, however, Activision's new Overwatch

4  league was a massive success. Activision was able to convince 12 teams, backed by billionaires

5  such as New England Patriots owner Robert Kraft, to agree to pay Activision a collective $240

6  million to join the league. In its Q1 2018 quarterly earnings report, Activision stated that "[a]s part

7  of our efforts to take advantage of the esports opportunity, during 2017 we completed the sale of 12

8  teams for the Overwatch League, the first major global professional esports league with city-based

9  teams, and the inaugural season is underway." Activision also stated in that earnings report that the

10  revenue it earned from its Overwatch league was one of the primary factors for the company's

11  increased quarterly revenue relative to Q1 2017.

12      13.    Unfortunately, it has since become clear that Activision's rent-seeking behavior with

13  respect to professional Overwatch created substantial economic injury to the Overwatch league's

14  team owners and players—the exact scenario that antitrust theory would have predicted.

15      14.    This same anti-competitive story ultimately played out with respect to the

16  professional Call of Duty market. Activision's acquisition of Major League Gaming in late 2016

17  already had resulted in an extreme concentration of the professional Call of Duty market. Activision

18  then cemented a **complete** monopoly over the professional Call of Duty market by refusing to grant

19  Call of Duty licenses to organizers and operators of other commercial Call of Duty competitions.

20  Thus, if a team of professional Call of Duty players wanted to continue to compete in professional

21  Call of Duty leagues and tournaments—which is essential to the players' and teams' maintaining

22  their ability to secure sponsorships and other "off-field" revenue opportunities—their only choice

23  was to do so in the Activision CoD League on terms dictated by Activision.

24      15.    Wielding its unlawful monopoly power as a virtual nuclear weapon, Activision

25  coerced 12 teams to: (i) pay Activision a $27.5 million "entry fee" for the privilege of being one of

26  the 12 teams allowed to participate in the Activision CoD League; (ii) give Activision an

27  unconditional 50% share of the revenue the team generated from ticket sales, sponsorships, and

28

- 6 -

other revenue streams; (iii) cede to Activision the exclusive right to contract with the most lucrative professional Call of Duty sponsors, such as energy drink companies (e.g., Monster Beverage and Mountain Dew) and military-related companies (e.g., USAA Insurance); (iv) cede to Activision the exclusive right to contract with broadcasters (e.g., cable television and streaming networks); (v) refrain from participating in or supporting any professional Call of Duty leagues or tournaments other than the Activision CoD League; (vi) prohibit the team's players from participating in or supporting any professional Call of Duty leagues or tournaments other than the Activision CoD League; and (vii) prohibit the team's players from engaging in any commercialized Call of Duty game play (e.g., streaming informal "friendlies" on YouTube or Twitch) outside the Activision CoD League. These rent-seeking and trade-restraining contractual provisions impermissibly enriched Activision at the expense of the professional Call of Duty players and teams that were now under Activision's thumb.

16.     Teams that did not (or could not) accede to Activision's extortionate demands were cut out of the professional Call of Duty market entirely. Because of Activision's anti-competitive conduct, for example, the professional Call of Duty market excluded the immensely popular team "100 Thieves," which was founded by the superstar player known as NadeShot. As stated by ESPN, "[i]t'll be sad to see Nadeshot & Co. absent from professional Call of Duty in 2020."

17.     Plaintiff Hector Rodriguez, who had individually owned and operated a successful professional Call of Duty team for years, was another victim of Activision's monopoly and anti-competitive conduct. Activision told Rodriguez that his team could participate in the new Activision league only if he "partnered" with billionaire investors that satisfied Activision's preferences. The terms of that forced partnership were, of course, financially devastating to Rodriguez, as Activision reasonably foresaw.

18.     The reason Activision took (and continues to take) these unlawful anti-competitive actions is simple—Activision saw a valuable market opportunity that it could quickly monopolize, not by providing a superior product but by (i) acquiring the leading professional Call of Duty league organizer (Major League Gaming); (ii) refusing to provide Call of Duty licenses to any other

- 7 -

commercial leagues or tournaments; and (iii) economically coercing the world's top professional Call of Duty players and teams either to commit exclusively to the Activision CoD League, on Activision's financially extortionate terms, or forego professional Call of Duty competitions altogether. Activision's internal forecasts predicted that, based on current growth rates, professional Call of Duty competitions could generate nearly $1 billion annually by 2030. Activision knew that acquiring and maintaining monopoly power over this market would enable Activision to take an extortionate share of this revenue, leaving the remaining table scraps (and all of the financial risk) to the players and teams on whose backs Activision would earn that revenue.

19.     Activision's monopolistic, trade-restraining, anti-competitive actions have caused substantial economic injury to Plaintiffs. Activision's unlawful actions forced Rodriguez to partner with billionaire investors whom Activision deemed suitable team owners. Rodriguez was then forced to agree to (i) pay an extortionate "entry fee" to Activision for the privilege of participating in the Activision CoD League, (ii) hand over as "rent" to Activision a disproportionate share of the sponsorship and other "off-field" revenue that the teams earned, and (iii) lose out on revenue opportunities, including sponsorships, that Activision prohibited the teams from pursuing as a condition of participating in the Activision CoD League.

20.     Plaintiff Seth Abner was similarly restrained as a player on an Activision CoD League team. Even after players, such as Seth Abner, retired from the Activision CoD League, Activision used its monopoly power to prevent these former players from accepting vast categories of revenue opportunities related to professional Call of Duty.

21.     Activision's unlawful conduct also caused Hector Rodriguez to suffer an economic injury unique to him. In September of 2020, Rodriguez—equipped with his newly re-acquired OpTic brand—sought to enter the newly monopolized market as an individual owner of an Activision CoD League team. Activision refused to approve Rodriguez as the "sole owner of a team," thereby excluding Rodriguez from the market. In late 2021, Activision forced Rodriguez to partner with wealthy investors that Activision preferred (namely, billionaire investors that were connected to a traditional sports franchise). As a condition of partnering with Rodriguez, these

billionaire investors demanded that Rodriguez grant them a 92.5% ownership share in his company OpTic IP LLC, an asset that has had a private market valuation of at least $100 million, if Rodriguez's OpTic-branded team continues to participate in professional Call of Duty.

22.     Activision's unlawful monopolization of the relevant market also caused economic injuries to plaintiff HECZ, LLC, the Delaware limited liability company that Rodriguez owns and manages, because it deprived HECZ, LLC of the continued ability to participate in the relevant market.

23.     Adding insult to significant injury, Activision has now effectively conceded that its operation of the Activision CoD League has been a colossal failure. *First*, Activision forced team owners to accept onerous new terms whereby the teams would have to release any claims against Activision in exchange for debt relief and a paltry sum of money. For the teams that did not acquiesce to Activision's terms, Activision has retaliated by threatening to withhold lucrative tournament hosting opportunities, thereby starving the teams of much needed revenue. *Second*, on January 30, 2024, just two days after the first "major" tournament of the 2024 Activision CoD League season in Boston, Activision fired 60 out of the 72 staff in their esports division, leaving just 12 employees (an 83% reduction in force). Put simply, Activision's monopoly has run the Activision CoD League into the ground.

24.     In sum—and as alleged herein—Activision violated antitrust laws and caused substantial damages to Plaintiffs. Activision secured a 100% monopoly over the market for professional Call of Duty leagues and tournaments, used that market power to eliminate competition, and forced team owners and players to either exit the market entirely or accept draconian anti-competitive terms that were favorable only for Activision and its monopoly. Plaintiffs now seek redress for Activision's unlawful conduct.

## **PARTIES**

### **A. Plaintiffs**

25.     Plaintiff Hector Rodriguez is a citizen of, and resides in, the State of Texas. Rodriguez—better known by his Call of Duty handle "H3CZ"—is the founder, manager, and face

of the legendary professional Call of Duty team "OpTic."  Rodriguez operates, owns, and controls various corporate entities that hold and commercialize OpTic's brand, intellectual property, and goodwill. These entities include OpTic, LLC, HECZ, LLC, and OpTic IP, LLC (collectively, the "OpTic Entities").

26.     Plaintiff Seth Abner is a citizen of, and resides in, the State of Texas. Abner is better known by his gamer tag "Scump."  He is the second winningest professional Call of Duty player of all time, with 30 tournament and league championships. In 2016, Abner won the Esports Console Player of the Year, and in 2020, Abner won the Activision CoD League Veteran Player of the Year. Abner is the only player in any esport to win back-to-back gold medals at the X-Games. Abner has over 2.7 million subscribers on YouTube, 1.6 million followers on Twitch, and 2.2 million followers on X (formerly Twitter).

27.     Plaintiff HECZ, LLC is a Delaware limited liability company with its principal place of business located at 160 Greentree Dr., Suite 101, Dover, Delaware 19904.  Rodriguez is the sole member of HECZ, LLC.

**B.  Defendant**

28.     Defendant Activision Blizzard, Inc. is a Delaware corporation and has its principal place of business in Santa Monica, California. Activision is one of the largest American video game developers and publishers, with approximately 9,500 employees and over 100 million players worldwide. Activision and/or its wholly-owned subsidiaries are the creators and copyright holders of the iconic Call of Duty video game franchise.

**C.  Defendant's Co-Conspirators and Agents**

29.     As a condition to participating in Activision's monopolized market for professional Call of Duty competitions, Activision, through its wholly-owned subsidiary Call of Duty League, LLC (the "League Office"), and the original team entities admitted into the Activision CoD League (the "Admitted Teams")[1] explicitly agreed that Activision held the exclusive right to grant or

---

[1] The original Admitted Teams included Atlanta Faze, Chicago Huntsmen, Dallas Empire, Florida Mutineers, London Royal Ravens, Los Angeles Guerrillas, OpTic Gaming Los Angeles, Minnesota ROKKR, New York Subliners, Paris Legion, Seattle Surge, and Toronto Ultra.

1  withhold consent to the sale or transfer of any Admitted Teams' participation rights in the Activision

2  CoD League.

3      30.    The League Office and each of the Admitted Teams, through their respective owners,

4  officers, directors, members, affiliates, parents and/or agents, participated as co-conspirators with

5  the Defendant in the offenses alleged in this Complaint and have performed acts and made

6  statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct. To be

7  clear, the Admitted Teams were involuntary co-conspirators, in that Activision forced them to agree

8  to contractual terms, and to agree to engage in conduct, that unreasonably restrained trade, as a

9  condition of Activision allowing them to participate in the relevant market.

10     31.    Plaintiffs reserve the right to name as defendants some or all of the entities or

11 individuals who acted as co-conspirators with Defendant in the alleged offenses.

12                          **JURISDICTION AND VENUE**

13     32.    Plaintiffs' claims in this lawsuit are brought under Sections 4 and 16 of the Clayton

14 Act, 15 U.S.C. §§ 15, 26, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2,

15 as well as Sections 16720 and 17200 *et seq.* of the California Business and Professions Code, and

16 Sections 3(2) and 3(3) of the Illinois Antitrust Act.

17     33.     This Court has original jurisdiction over the subject matter of all causes of action

18 alleged in this Complaint pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has subject matter

19 jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because Plaintiffs' state law

20 claims are so related to the federal question claims that they form part of the same case or

21 controversy that would ordinarily be tried in one judicial proceeding.

22     34.    This Court has both general and specific personal jurisdiction over Defendant,

23 pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because (i) the Defendant's principal

24 places of business is located in this district, (ii) Defendant may be found and transacts business in

25 this district, and (iii) the Defendant's anti-competitive conduct occurred and effected commerce in

26 this district.

27

28

35.     Venue in this judicial district is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 1391 of Title 28, 28 U.S.C. § 1391, in that Defendant is an entity residing within this judicial district.

## RELEVANT MARKET

36.     The relevant market is professional Call of Duty competitions—that is, Call of Duty leagues and tournaments where (i) teams of professional Call of Duty players pay the league or tournament organizer a fee for the privilege of competing against each other for prize money and prestige; and (ii) the players, teams, and league/tournament organizers seek to generate commercial revenue through the sale of tickets, broadcast rights, merchandise, advertising rights, and sponsorships (the "CoD Market"). The "sellers" in this market are the league and tournament organizers, and the "buyers" are the players and teams who participate in the competition. The relevant geographic market is global.

37.     Although there are "esports" competitions based upon video games other than Call of Duty (e.g., "The International," a tournament based on the Valve LLC game Dota), these other leagues and tournaments are not substitutes for or interchangeable with professional Call of Duty leagues and tournaments. This distinctiveness is true from the perspectives of the players, teams, and fans. To become a successful professional video game player, an individual must focus on and specialize in one particular game—not unlike how professional athletes in traditional sports specialize in one particular sport (save for once-in-a-generation athletes such as Bo Jackson). It takes years of intense training for an individual to become skilled enough at a particular video game to compete professionally at the highest level. To maintain competitiveness, that individual must continue that intense specialized training. In other words, a team of professional Call of Duty players cannot realistically switch to playing professional Halo (a futuristic, apocalyptic first-person shooter game involving space travel and aliens), just as the Los Angeles Lakers could not realistically switch from playing the National Basketball Association to Major League Baseball.

38.     Additionally, the fans, who passionately follow professional Call of Duty, do not consider other esports to be substitutes—just as passionate NFL fans do not consider, say,

professional tennis to be a substitute for professional football. Thus, even if a legendary Call of Duty team (like Rodriguez's OpTic team) could somehow turn its Call of Duty players into, for example, a successful professional Halo or Minecraft team, the fan base would not be interchangeable. By switching esports, a professional Call of Duty team would lose the very fan base that generated lucrative sponsorships and other "off-field" revenue and, in turn, made the team and players commercially valuable in the first place.

39.     With respect to the CoD Market, the barrier to entry for a would-be Activision competitor is substantial. Indeed, the barrier to entry is insurmountable given that Activision's anti-competitive conduct includes (i) refusing to provide Call of Duty licenses, which is an essential facility to a professional Call of Duty competition, to such would-be competitors; and (ii) prohibiting the teams and players participating in the Activision CoD League from participating in any other professional Call of Duty competitions.

## **ANTI-COMPETITIVE CONDUCT**

### A.  **Pre-Monopoly Competition in the CoD Market**

40.     The first organized Call of Duty competitions were sporadic online tournaments and small local events that offered modest prize purses.  It did not take long, however, before the top Call of Duty players and teams, and the passionate Call of Duty fans, began clamoring for additional, bigger, and more formal competitions.

41.     In 2008, Major League Gaming responded to this growing demand by organizing and conducting at the Hard Rock Hotel in Las Vegas the first major professional Call of Duty tournament, which it called "The Major League Championship."

42.     From 2008 through 2016, Major League Gaming continued to organize and conduct professional Call of Duty leagues and tournaments. By 2015, the Major League Gaming "World Finals" offered a total prize purse of $250,000, with the winning team receiving $100,000. The competition was an open one, and 63 teams qualified for the championship round through regional qualifier events. During this time, Rodriguez's OpTic became widely regarded as one of the best Call of Duty teams. OpTic boasted an almost unstoppable roster of players, including Plaintiff Seth

1   Abner, who led OpTic in securing more championships than any other professional Call of Duty
2   team—amounting to more than $1,500,000 in prize money.

3          43.    Major League Gaming was just one of the entities that organized and conducted
4   professional Call of Duty competitions during the 2008-2016 period. Other competitions were
5   organized and conducted by, among others, ESL Gaming GmH, DreamHack, UMG Gaming,
6   Gfinity Esports, CheckMate Gaming, and GameStop. League and tournament organizers tried to set
7   themselves apart either through lucrative prize pools, qualifier formats, and unique viewership
8   experiences. For example, in 2009, GameStop announced that its "World at War National
9   Tournament" would be an open, tiered tournament consisting of local, district, and regional rounds
10  followed by a 32-team championship round held on the deck of the USS Midway aircraft carrier in
11  the San Diego Bay.

12         44.    An essential facility to these professional Call of Duty competitions was, of course,
13  the video game Call of Duty itself. As the copyright holder of each game in the Call of Duty
14  franchise, Activision provided licenses to the league and tournament organizers.

15         45.    In 2011, Activision decided that it would enter the professional Call of Duty market
16  by organizing its own tournament, which it called "Call of Duty XP 2011."  Activision's entry into
17  the professional Call of Duty market increased competition in the market and, therefore, was
18  presumptively good for the entire professional Call of Duty ecosystem.

19         46.    The increasing popularity of the Call of Duty franchise, combined with the rapid
20  growth of internet streaming networks such as YouTube and Twitch, social media, and "influencer
21  marketing" ignited a period of rapid and substantial growth in the professional Call of Duty market.
22  The top players and managers, such as Rodriguez (H3CZ) and Seth Abner (Scump), achieved rock-
23  star status, with millions of followers on social media. Major consumer brands began sponsoring
24  top teams such as OpTic. These lucrative sponsorships enabled teams to pay increasingly lucrative
25  salaries to their players, who in turn dedicated themselves to their craft, training for 10 to 12 hours
26  per day and flying around the world to compete in competitions held in packed stadiums and
27  watched by tens or even hundreds of millions of adoring fans.

28

**B.  Activision Unlawfully Acquired 100% Monopoly Power**

47.     Recognizing the rapidly growing commercial opportunity presented by professional Call of Duty competitions, in January 2016 Activision acquired Major League Gaming—the leading professional Call of Duty competition organizer—for $46 million. In a statement about the acquisition, Activision's CEO Bobby Kotick said, "Our acquisition of Major League Gaming's business furthers our plans to create the ESPN of esports. MLG's ability to create premium content, its proven broadcast technology platform—including its live streaming capabilities—strengthens our strategic position in competitive gaming." Activision stated that it acquired Major League Gaming with a "long-term strategy of monetization through advertising, sponsorships, tournaments, and premium content."

48.     Activision further described its intent in public filings, writing in one 10-K:

> We are focused on identifying and investing in business opportunities that extend our existing franchises into adjacent entertainment verticals, deepen audience engagement by celebrating our players, deliver high production values to our communities, and provide greater opportunities for player investment. This includes investments in our Media Networks and Studios businesses. Our Media Networks business acquired Major League Gaming Inc. ("MLG") which provides an immediate expansion of our reach across the rapidly-growing eSports ecosystem by adding proven live streaming capabilities and technologies.

49.     Although Activision's acquisition of Major League Gaming substantially increased Activision's market power in the professional Call of Duty market, the transaction was not subject to the Scott-Hart-Rodino Act's pre-merger notification requirements, and the FTC did not review the transaction for potential anti-competitiveness.  On information and belief, Activision's intent in acquiring Major League Gaming was to eliminate the entity that Activision considered its primary competitor in the professional Call of Duty market and the primary impediment to Activision acquiring monopoly power.

50.     Simultaneously, Activision stopped granting licenses to use the Call of Duty game to any other tournament or league organizers (i.e., Activision's competitors in the market for professional Call of Duty competition). Activision's refusal to deal with other tournament and league organizers signified a termination of Activision's decade-long profitable course of business

- 15 -

with its competitors in the market. On information and belief, by refusing to deal with other tournament and league organizers, Activision sacrificed short-term revenues (i.e., license fees that other would-be professional Call of Duty tournament and league organizers would have paid) in order to further its unlawful monopolistic plan to drive all potential competitors out of the CoD Market. On information and belief, Activision knew that, as the sole remaining tournament and league organizer in the market, Activision could *inter alia*, set supra-competitive terms for teams and players to participate in the only league in the CoD Market.

51.     As a result of Activision's acquisition of Major League Gaming and termination of its prior course of dealing with all other tournament and league organizers, Activision acquired a 100% monopoly in the CoD Market. As the sole tournament and league organizer remaining in that market, Activision was able, without the mediating force that competition provides, to (1) restrict the number of teams and players admitted into its newfangled professional Call of Duty league, (2) demand an extortionate entry fee from each team, (3) take for itself a disproportionate share of the league's revenue, (4) force teams and players to agree to a host of anti-competitive, unfavorable contracts in restraint of trade; and (5) exclude from the CoD Market any and all teams or players who did not acquiesce to Activision's terms.

**C. <u>Activision Abused Its Monopoly Power</u>**

52.     Beginning in 2019, Activision unlawfully exerted its monopoly power to (1)  restrict the number of professional Call of Duty leagues in the CoD Market to one—the Activision CoD League; (2) eliminate all tournaments in the CoD Market except for Activision's CoD League tournaments; (3) limit the number of teams within the CoD market to twelve; (4) set the price for entry into the Activision CoD League at $27.5 million plus the acquisition of an Activision-approved corporate partner if the prospective team owner was an individual; (5) suppress wages for players on those twelve teams through a Competitive Balance Tax; (6) force teams to agree to the unfavorable and anti-competitive terms embedded in Activision's <u>form</u> "Team Participation Agreement," including a provision that granted Activision sole discretion to grant or withhold consent to the sale of any team to a new owner; and (7) force players to agree to the unfavorable

and anti-competitive terms embedded in Activision's <u>form</u> "Player Professional Services Agreement," including provisions that prohibited players from streaming content that competed with Activision's own interests.

i.   Restriction on Number of Leagues and Number of Teams

53.   As stated above, Acquisition had monopoly power in the CoD Market following the acquisition of Major League Gaming and the termination of its prior course of dealing with all other tournament and league organizers. Activision also held the ultimate goal of limiting the number of professional Call of Duty leagues to just one (owned and operated by Activision) and setting supra-competitive prices for entry into the league and its tournaments. Nonetheless, Activision waited to take full advantage of its monopoly power until it was confident that a sufficient number of teams and players would agree to their anti-competitive restraints and extortionate pricing.

54.   To that end, Activision tested its anti-competitive strategy in the different and substantially smaller market for professional Overwatch competitions. Activision became the sole organizer of Overwatch tournaments and leagues and then set a supra-competitive price for entry into Activision's Overwatch League. Unlike any other league to date, Activision's Overwatch League was a "closed" league. Activision capped the league at 12 teams, selling each of the 12 team "slots" for $20 million. Because Overwatch was a substantially less popular game than Call of Duty, particularly amongst United States consumers, Activision viewed its new Overwatch League as a low-risk way to test whether Activision could reap substantial revenue from a closed-league requiring teams to pony up massive entry fees. If the newfangled Overwatch League was a failure, it would not taint the goodwill of Activision's far more important Call of Duty franchise.

55.   Activision's new Overwatch League was a massive success—at least for Activision: Activision secured a total of $240 million in entry fees from 12 teams, backed by billionaires such as New England Patriots owner Robert Kraft, to join the league.

56.   While Activision waited to see the results of its Overwatch League trial, Activision hosted the "Call of Duty World League" (the "CoD World League"). The CoD World League was an open league that allowed for promotion and relegation between divisions based on performance

- 17 -

1    during the season. To participate in the CoD World League, teams needed to pay only a modest

2    entry fee and show their game-playing mettle in qualifying events.

3        57.    Through at least the summer of 2019, team owners had the ability to transfer interests

4    in their teams to new owners without oversight, and players enjoyed the freedom to move between

5    teams. The market—not Activision—controlled the value of the teams and players. For example, in

6    October of 2017, Plaintiff Hector Rodriguez agreed to sell a majority interest in his OpTic team to

7    Legacy Esports & Entertainment, LLC ("Legacy") for $20,000,000. Moreover, through the end of

8    2019, teams such as Rodriguez's OpTic team remained free to participate in the CoD Market by

9    selling team-logoed merchandise to adoring fans; contracting with broadcasters such as YouTube

10   and Twitch; and contracting with big-brand sponsors like Red Bull and Coca Cola. Players and

11   teams were not restricted from participating in non-Activision-organized competitions, such as

12   "friendlies" against rivals. Nor were players and teams restricted from monetizing their popularity

13   through social media and influencer marketing. Notably, players and teams were not required to

14   share with Activision any of those revenues that they earned in the CoD Market.

15       58.    Once it became clear that the Overwatch League was a success for Activision,[2]

16   Activision acted on its ultimate plan to use its 100% monopoly to enrich Activision at the expense

17   of the players and teams. Activision formed the sole professional Call of Duty league—and, in turn,

18   owned the sole tournaments—in the market.

19       59.    Indeed, in 2019, Activision ended the profitable CoD World League and replaced it

20   with the Activision CoD League. Whereas the CoD World League was an open league with modest

21   entry fees, the Activision CoD League was a closed league limited to just twelve team "slots" each

22   connected to a city of Activision's choosing, that Activision would sell. Since its inaugural season

23   in 2020, the Activision CoD League has been the **only** professional Call of Duty in the world—as a

24   consequence of Activision's unlawful, anti-competitive conduct.

25

26

27   _____

[2] Unfortunately, it has since become clear that Activision's rent-seeking behavior with respect to professional Overwatch created substantial economic injury to the Overwatch League's team owners and players—the exact scenario that antitrust theory would have predicted.

28

ii.  Setting Supra-competitive Entry Fees and Requiring an Activision-Approved Partner

60.     Activision set the price for each "slot" in the Activision CoD League at $27.5 million and required the entry fee be paid by an Activision-approved corporate team entity. In the event that the team owner was an individual, the practical effect of the corporate entity requirement was to force individual team owners (like Rodriguez) to sell their historical, profitable Call of Duty-related brands (such as OpTic) to corporate partners for no reason other than to satisfy Activision's extortionate entry fee.

61.     As a result, team owners, like Rodriguez, who owned teams in the professional Call of Duty market for years were faced with a Hobson's choice: agree to Activision's extortionate ownership requirements (including selling their historical, profitable Call of Duty-related brands to Activision-approved corporate partners and paying a $27.5 million entry fee for the privilege of continuing to compete in professional Call of Duty events), or vanish from the professional Call of Duty scene entirely.

62.     In late 2020, Rodriguez attempted to become an independent team owner in the Activision CoD League. Because of Activision's monopoly, the only option to own a team participating in the CoD Market was through Activision's CoD League. To that end, Rodriguez executed a binding term sheet with Immortals Gaming Club whereby Rodriguez would reacquire full ownership of his OpTic brand and purchase the franchise "slot" then owned by Immortals Gaming Club. However, as the result of an agreement between Activision and the Admitted Teams in the Activision CoD League, Activision claimed a unilateral, unfettered right to review and approve (or deny) the transaction. Activision first asked Rodriguez to provide proof that he had at least $3 million in capital. After Rodriguez provided such proof, Activision then moved the goalposts, demanding that Rodriguez provide Activision proof that he could secure a $10 million letter of credit. Before Rodriguez had the chance to satisfy Activision's new condition (which he easily could have done), Activision told Rodriguez it would never allow him to own and operate a team on his own. On a conference call, one Activision executive explicitly told Rodriguez that he was not the "type of owner" Activision wanted for the league. Activision made clear to Rodriguez

- 19 -

that he would be required to "partner" with billionaire investors who "looked" like Activision's ideal or leave the professional Call of Duty market altogether. As a result of this threat, Rodriguez was forced to "partner" with investors that met Activision's approval. Under the terms of the forced partnership, Rodriguez had to agree to relinquish more than 90% of the equity in his OpTic brand.

63.     Rodriguez would have operated his own team, under his newly re-acquired OpTic brand, and would not have partnered with Hard Carry Gaming or Envy Gaming, Inc., absent the economic duress imposed on Rodriguez by Activision, which left him with no viable alternatives.

> iii.     Coercing Teams and Players to Sign Unfavorable Agreements That Constitute Anti-Competitive Restraints on Trade

64.     Activision exerted its monopoly power to force teams and players—under threat of exclusion from the market—to agree to unfavorable agreements that constitute anti-competitive restraints on trade.

65.     For example, on or about January 21, 2020—just three days before the inaugural Activision CoD League tournament—Activision convened a mandatory make-up "Call of Duty League Player Summit" to prepare for the upcoming Activision CoD League season. While at the Summit, and after Plaintiff Seth Abner had already executed the Player Professional Services Agreement, Activision demanded that Abner sign an acknowledgment binding him to the "Official Rules, Terms and Conditions" of the Call of Duty League. The Rules, which had not previously been presented to Abner (or his counsel or agent), were dozens of pages long, single-spaced, and replete with anti-competitive and unlawful restrictions, such as precluding players from accepting sponsorships or brand deals. The accompanying Player Streaming Agreement prohibited players, while streaming, from receiving "any direct or indirect compensation" from publishers of "Non-Activision Blizzard Games." When Abner requested time and an opportunity to have his counsel review the Rules prior to execution, Activision told Abner that if he did not immediately execute the Rules, Abner would be removed from Hector Rodriguez's team (known at the time as Chicago Huntsmen) in the Activision CoD League. Because the inaugural Activision CoD League tournament was just days away, Abner reluctantly signed the Rules.

66.     Abner later posted about the coercive exchange on X (formerly Twitter), writing:



**OpTic Scump** ✔ 🎮
@scump                                                         ...

The CDL also made us sign a player "contract" in front of them without allowing us to run it by our lawyers at the player summit. It was a "sign it now or you can't play at Minnesota" type exchange. I'm probably gonna get fined for this too just letting y'all know 👌

10:32 AM · Nov 15, 2020

**2,637** Reposts   **840** Quotes   **59K** Likes   **123** Bookmarks

67.     Activision's threat to exclude teams and players from the market was purposefully made to coerce players and teams to agree to the anti-competitive and unfavorable terms of the Activision CoD League (as set forth in the Team Participation Agreement and Player Professional Services Agreement). Activision's use of their monopoly power for this illegitimate purpose makes a mockery of freedom of contract and undermines the proper functioning of our economic system.

68.     Moreover, by 2019, teams and players had already dedicated many years and millions of dollars to the professional Call of Duty competition market. As such, the threat of being excluded from the market—and the resulting loss of their Call of Duty careers, teams, and/or return on their extensive investments in the professional Call of Duty competition market—was so coercive that it caused teams, including Rodriguez's Chicago Huntsman (later, OpTic Chicago then OpTic Texas) and players, including Seth Abner, faced with no reasonable alternative, to agree to the unfavorable and anti-competitive terms of the Team Participation Agreement and/or Player Professional Services Agreement, Rules and the Player Streaming Policy.

69.     Team owners, including Rodriguez, would not have consented to pay the extortionate $27.5 million entry fee or agreed to any of the other anti-competitive terms in the Team Participation Agreement, as set forth throughout this Complaint, absent the economic duress imposed on them by Activision, which left them with no other viable options. Nor would Plaintiff Abner have consented to the anti-competitive and unfavorable terms of the Player Professional Services Agreement, Rules, and the Player Services Policy as set forth throughout this Complaint, absent the economic duress imposed on him by Activision, which left him with no other viable options.

70.     Accordingly, Plaintiff Rodriguez partnered with investors he did not need and, ultimately, signed the Team Participation Agreement (albeit in a corporate capacity), and Plaintiff Abner executed the Player Professional Services Agreement Rules, and Player Services Policy under circumstances that constitute economic duress.

**D.  <u>Activision Exploited Its Unlawful Monopoly to the Detriment of Players and Teams</u>**

71.     Activision's 100% monopoly over professional Call of Duty means that any team that wishes to participate in the CoD Market is limited to a single source—Activision. This has enabled Activision to demand extortionate fees and other concessions in exchange for allowing the team to participate in the Activision CoD League. Activision's monopoly power also has enabled Activision to run the Activision CoD League principally for the financial benefit of Activision, making decisions that are financially detrimental to the players and teams but beneficial to Activision.

72.     Prior to the formation of the Activision CoD League, organizers sold league and tournament broadcasting rights to a variety of broadcasters, including online streaming services like Twitch, media platforms like YouTube and Facebook, and conventional cable networks like ESPN. Because the professional Call of Duty market was a competitive one that offered players and teams a variety of choices (i.e., choices about which leagues and tournaments they should enter), league and tournament organizers had an incentive to sign broadcasting rights contracts that were beneficial to the players and teams, rather than just the organizer. That changed once Activision attained its 100% monopoly over the professional Call of Duty market. Activision granted YouTube, a wholly-owned subsidiary of Google, the exclusive broadcasting rights to the Activision CoD League, notwithstanding that it would have been more financially beneficial to players and teams for the CoD League to be broadcast either by multiple networks or by YouTube's competitor Twitch. On information and belief, Activision granted the exclusive broadcasting rights to YouTube in exchange for price concessions from Google with respect to the Google cloud services that Activision uses for its videogame platforms.

73.     Activision also used valuable advertising and sponsorship space to promote Activision's own products, essentially giving away for free advertising and sponsorship space that third-party advertisers and sponsors would have paid for. This benefited Activision at the expense of the teams, because whereas using advertisement and sponsorship space to promote Activision's products benefitted Activision exclusively, the teams would have been entitled to a share of the additional league revenue that Activision would have generated had it sold the advertising and sponsorship space to third parties.

74.     The "Team Participation Agreement" that Activision coerced teams to sign as a condition of participating in the Activision CoD League also contained several key terms that were financially extortionate and/or trade-restraining in nature. In addition to requiring each team to pay Activision a $27.5 million fee that the Team Participation Agreement called an "entry fee," the Team Participation Agreement also contained, *inter alia*, the following provisions that exploited Activision's unlawful monopoly and restrained trade in the relevant market in clearly anti-competitive ways:

    a.  A series of provisions that, in the aggregate, prohibits teams and players from engaging in any commercialized Call of Duty game play or content creation outside of the Activision CoD League, including creating team-owned streaming and social media content relating to Call of Duty. These provisions effectively prevent the most popular professional Call of Duty teams and players—including Rodriguez's OpTic team—from creating independent content that sponsors and advertisers might prefer over the Activision CoD League content that Activision controls.

    b.  Provisions prohibiting teams and players from accepting "any direct or indirect compensation from any publisher, producer, owner, or licensee" of a non-Activision Blizzard Game, or from promoting or endorsing any "competitor of the [Activision CoD] League." These provisions help insulate Activision from any new competitive threats to its professional Call of Duty monopoly.

c. Provisions prohibiting teams from obtaining sponsorships from companies involved in videogame platforms, athletic wear, energy and soft drinks, water, payment services, computer monitors and graphics cards, casinos, military, and alcoholic beverages (i.e., the most lucrative sponsorships), and instead granting Activision the exclusive right to contract with such sponsors. These coercive provisions essentially carve up the sponsorship market, with Activision receiving the most lucrative portion of that market. The provisions are injurious to teams and would-be sponsors, which might prefer to sponsor particular teams rather than attaching themselves to Activision (a company with a problematic history of employment discrimination).

d. Provisions requiring each team to pay all of its gross revenues, regardless of source, into a "Revenue Sharing Pool," with 50% of the pool being diverted to Activision— in exchange for no services rendered—and the remaining 50% of the pool distributed pro rata to the teams. For a popular team such as Rodriguez's OpTic team, these classic rent-seeking provisions amounted to a "tax" on gross revenues substantially in excess of 50%, for which the teams received nothing in return.

e. Provisions prohibiting teams from paying fair market value compensation to their players, including superstar players such as plaintiff Seth Abner, which among other things suppressed the players' wages.

75. Faced with no reasonable alternative to remain within the relevant market, Plaintiff Rodriguez, as a member of Duo Over Ventures LLC, executed the Team Participation Agreement on September 10, 2019.[3]

76. In addition to the restraints set forth in the Team Participation Agreement, Activision also required teams to use a form "Player Professional Services Agreement" (incorporating the Rules and streaming policies) when contracting with players in the Activision CoD League, which

---

[3] Plaintiffs entered a tolling agreement with Activision on August 28, 2023, which ran through October 7, 2023. A second tolling agreement was entered into on November 14, 2023, and this ran through February 1, 2024.

1    contained, *inter alia*, the following provisions that exploited Activision's unlawful monopoly and
2    restrained trade in the relevant market in clearly anti-competitive ways:

3        a.  A series of provisions that, in the aggregate, prohibit players from engaging in any
4            commercialized streaming and social media content relating to Call of Duty or any
5            other video game, even during the off-season. These provisions effectively prevent
6            the most popular professional Call of Duty teams and players—including Abner—
7            from creating independent content that sponsors and advertisers might prefer over
8            the Activision CoD League content that Activision controls.

9        b.  Provisions granting Activision a "royalty-free, fully paid-up, worldwide right and
10           license (with the right to grant sublicenses)" to use, *inter alia*, the players' names,
11           nicknames, gamer tags, likenesses, images, voices, videos, biographies, and personal
12           backstories for nearly any purpose related to esports in general—i.e., not necessarily
13           related to the Activision CoD League. This provision specifically requires players to
14           grant Activision the right and license, "without the payment of additional
15           compensation," to create reality programming, documentaries, or other programming
16           content by recording players and their daily life activities and interactions with others
17           using "persistent, 24/7 cameras or other recording devices or technology." This
18           provision compels players to transfer completely to Activision, in exchange for *no*
19           *consideration*, the right and ability to monetize the players' brands.

20   77.    Activision's restrictions upon professional players substantially lessened players'
21   compensation inside and outside of the league. For example, on October 9, 2020, Activision's "Vice
22   President, Leagues Administration" issued a disciplinary letter to Plaintiff Abner for "promoting a
23   sponsored Raid: Shadow Legends stream, as well as an affiliate link to download the game." Abner's
24   post was made during the off-season on his personal X (formerly Twitter) page. Activision claimed
25   that Abner's conduct was in violation of the Call of Duty League Official Rules and the Player
26   Streaming Policy because "Call of Duty League Players are permitted to stream non-Activision
27   Blizzard games, but are prohibited from encouraging viewers to purchase them, receiving

28

compensation from the game publisher, and otherwise advertising, endorsing or promoting such games in their streaming or social media channels (see Section 3.6 of the Official Rules and Sections 6(iv), 7, and 8 of the Player Streaming Policy)." Abner criticized Activision's restrictive and anti-competitive conduct, posting:



**OpTic Scump** ✓ ◎
@scump

I haven't spoken of this publicly really, but I was fined for playing Raid Shadow Legends during a sponsored stream. It was during the off season as well which makes it worse. My channels are MY channels. I should be able to do what I please, but apparently I cant.

10:24 AM · Nov 15, 2020

**1,266** Reposts    **227** Quotes    **42.4K** Likes    **68** Bookmarks

78.     Nevertheless, faced with no reasonable alternative to remain within the relevant market, and under circumstances that constitute economic duress, Plaintiff Abner executed the Player Professional Services Agreement on October 10, 2019. This economic duress was a direct consequence of Activision's unlawful 100% monopolization of the professional Call of Duty market.

79.     Further, through the Team Participation Agreement and Player Professional Services Agreement, Activision bound teams and players, respectively, to the terms of the Activision CoD League's Charter, including a provision that Activision euphemistically labeled a "Competitive Balance Tax."  In fact, the "Competitive Balance Tax" was an unlawful salary cap that prohibited teams from paying fair market value salaries to their players and suppressed players' wages, including the wages of plaintiff Seth Abner. In April 2023, the United States filed a civil antitrust complaint against Activision based on the unlawful "Competitive Balance Tax."  *See United States v. Activision-Blizzard, Inc.*, Case No. 23-cv-00895 (D.D.C.), ECF No. 5. On July 11, 2023, the District Court entered final judgment against Activision under Section 1 of the Sherman Act, 15

U.S.C. § 1. As set forth in the Competitive Impact Statement that the Department of Justice filed in that action, Activision's unlawful conduct had the purpose and effect of illegally suppressing players' wages. *See id.* at 1-2, 5. Plaintiff Seth Abner was among the players most substantially harmed by the illegal "Competitive Balance Tax."

80.     But for Activision's total monopoly over professional Call of Duty competitions, Activision would not have been able to insist on, and teams and players, respectively, would not have agreed to, the Team Participation Agreement's, Player Professional Services Agreement's, and/or Activision CoD League Charter's financially extortionate and trade-restraining terms described above.

81.     No legitimate business reason justifies Activision's conduct. Activision did not engage in its conduct to increase output, enhance efficiency, lower prices, improve quality, ensure quality control, or make the relevant market more competitive. Monopolizing the market for professional Call of Duty competitions was also not necessary to protect Activision's goodwill, because using contractual quality specifications would have proven sufficient.

## ANTI-COMPETITIVE EFFECTS

82.     Activision's anti-competitive conduct has had profoundly negative effects on the relevant market, as is evidenced by the recent firing of 83% of all esports staff.

83.     Secure in its 100% monopoly over professional Call of Duty competitions, Activision has had no incentive to innovate or improve upon the professional Call of Duty competitions that it organizes. For example, with respect to prize purses, Activision has eschewed the crowdfunding model that Valve LLC has used to fund its prize purses for its Dota tournament "The International."  While The International's prize purses have reached as high as $40 million for a single tournament, prize purses in the Activision CoD League have actually decreased by approximately 40% since the league's inception. Activision's lack of innovation has caused overall fan interest in the Activision CoD League to diminish, which in turn has diminished the league's ability to attract and keep lucrative commercial sponsors.

84.     Activision's extortionate revenue sharing requirements, under which Activision receives 50% of the gross revenues that each team in the Activision CoD League generates, has diminished the profitability and financial resources of the teams, which already were financially weakened by the $27.5 million "entry fee" that Activision imposed and which saddled teams with significant debt which hindered their ability to raise capital. This, in turn, has prevented the teams from increasing player salaries and improving the players' training resources, which in turn has negatively impacted the overall quality of play, which in turn has negatively impacted fan interest, which in turn has negatively impacted the teams' commercial values.

85.     Activision's exclusive broadcasting deal with YouTube has completely eliminated competition between broadcasters with respect to professional Call of Duty competitions. This lack of competition, on information and belief, has diminished YouTube's incentive to innovate with respect to its broadcast of the competitions, which has negatively impacted the viewership experience for fans, which in turn has negatively impacted the commercial value of the teams.

86.     Combined with its 100% monopoly over professional Call of Duty competitions, Activision's decision to limit the Activision CoD League to 12 teams has drastically reduced the number of players and teams that are playing professional Call of Duty. Prior to this, 123 teams competed in MLG's Spring Championship in 2013; 63 teams competed in the MLG's World Championship in 2015; and 32 teams competed in Activision's CWL Championship in 2017 and 2018. These figures do not even include the thousands of teams that competed in local and regional qualifying rounds. The drastic reduction in the number of teams and players competing in professional Call of Duty has diminished fan interest and, as a result, the commercial value of even the most popular teams, such as Rodriguez's OpTic team.

87.     Activision forced teams to agree to abide by a "Competitive Balance Tax," which the Department of Justice found was a patently illegal condition that Activision imposed on teams, team owners, and players. Activision's illegal "Competitive Balance Tax" was intended to and did dramatically suppress the wages earned by professional Call of Duty players, including Plaintiff Seth Abner. Moreover, because it impaired teams from improving their rosters and further bolstering

the value of their brands, the "Competitive Balance Tax" inflicted economic injury on the teams and team owners as well.

88.     Activision's anti-competitive conduct also had negative effects on third-party advertisers and sponsors. If such advertisers and sponsors wanted to connect with the professional Call of Duty competition market, Activision's monopoly left them with one choice: Activision's CoD League. In addition, Activision's "Team Participation Agreement" terms allocated the most lucrative sponsorship categories to Activision, preventing would-be sponsors in those categories from sponsoring individual teams (such as Rodriguez's OpTic team) rather than the Activision CoD League as a whole.

89.     Activision's conduct has yielded no pro-competitive benefits. It has simply enriched Activision at the expense of the other market participants and the quality of the market—just as antitrust theory would have predicted. Any possibility that any pro-competitive effects would result from Activision's conduct is nonexistent or remote.

## ANTITRUST INJURIES

90.     Plaintiffs have suffered myriad economic injuries cognizable under federal and state antitrust laws of which Activision's anti-competitive conduct was the cause-in-fact and proximate cause.

91.     Until 2017, Rodriguez was the sole owner of OpTic, an asset with a private market valuation of at least $100 million based on recent funding rounds. OpTic's valuation is directly connected to the success of Rodriguez and his OpTic team in professional Call of Duty competitions. If Rodriguez and his OpTic team were unable to participate in professional Call of Duty competitions, the value of OpTic (and the rest of the OpTic Entities) would plummet.

92.     In 2021, after Rodriguez re-acquired 100% of the OpTic brand, Activision exercised its right, pursuant to an agreement between it and the Admitted Teams, to withhold consent of the sale of the Los Angeles franchise spot to Rodriguez. Indeed, despite Rodriguez's substantial preparations to become the sole owner of a team in the league, including providing to Activision proof that he had the financial means to satisfy the unpaid portion of the extortionate $27.5 million

"entry fee" that teams were forced to agree to as a condition of participating in the Activision CoD League as a team owner, Activision informed Rodriguez that, if he wanted to continue to be affiliated with the Activision CoD League, he would be required to partner with a new group of billionaire investors. Activision's requirement that Rodriguez "partner" with the billionaire investors had no pro-competitive justification—indeed, some of the teams ostensibly run by wealth investors are now in dire financial straits as a result of Activision's conduct—and it foreseeably resulted in Rodriguez sustaining substantial economic injuries under the terms of the forced "partnership."

93.     Activision's refusal to deal with Rodriguez as a sole owner of a team, and instead to require him to partner with a new group of billionaire investors, put Rodriguez in an extraordinarily vulnerable position. Refusing to accede to Activision's demands would mean that Rodriguez and his OpTic team would be frozen out of the professional Call of Duty competition market altogether. And the billionaire investors that Activision forced Rodriguez to partner with knew that they could demand extortionate concessions from Rodriguez. Ultimately, Activision's conduct forced Rodriguez to give to the billionaire investors' company Envy Gaming, Inc. a 92.5% ownership share of OpTic.

94.     As a direct and proximate result of the Defendant's illegal conduct alleged in this Complaint, Plaintiffs have been injured in an amount to be determined at trial but believed to be more than $120,000,000.

95.     Rodriguez's damages caused by the loss of interest in his OpTic brand were exacerbated by (i) Activision's extortionate $27.5 million "entry fee," (ii) Activision's extortionate, rent-seeking revenue sharing requirement, (iii) Activision's anti-competitive allocation of the sponsorship market, (iv) Activision's decision to select YouTube as the exclusive broadcaster of the Activision CoD League (a decision that financially benefitted Activision at the expense of team owners), (v) Activision's self-dealing with respect to advertising and sponsorship space (which benefitted Activision while reducing total league revenue that otherwise would have been shared with the team entities), and (vi) the stagnant and indeed declining prize purses offered by Activision.

Activision's self-interested decisions and failure to innovate or maintain the quality of the Activision CoD League were possible only because the total lack of competition in the professional Call of Duty market, which Activision could not have been able to accomplish but for its unlawful monopoly power.

96.     Rodriguez was further injured by Activision's monopolization of the professional Call of Duty market, and Activision's unfettered authority to control the resale of franchise spots, which had the effect of (i) prohibiting Rodriguez from individually owning a professional Call of Duty team, (ii) prohibiting Rodriguez from individually engaging in and creating commercial Call of Duty content, and (iii) dramatically impairing Rodriguez's ability to monetize the OpTic brand. Activision's monopolization of the professional Call of Duty market also prevented Rodriguez from participating in, and earning revenue from, professional Call of Duty competitions not owned and organized by Activision.

97.     Rodriguez also suffered substantial harm as a result of Activision's $27.5 million "entry fee" requirement and Activision's demand that he satisfy that "entry fee" requirement by partnering with billionaire investors that Activision preferred. To satisfy Activision's demand, Rodriguez was coerced into giving the billionaire investors a substantial share of ownership in his company OpTic IP, LLC ("Optic Gaming").

98.     Abner also suffered antitrust injuries as a result of Activision's anti-competitive conduct. Specifically, Abner's wages were artificially and illegally suppressed by Activision, and further, he was forced to give away to Activision for free his most valuable commodity (*viz.*, his name, image, and likeness). In addition, Plaintiff Abner was prohibited by Activision from availing himself of lucrative commercial opportunities such as sponsorships and streaming. This prohibition alone cost him millions of dollars over the relevant time period.

99.     Abner was also injured by Activision's elimination of competitors that would have organized professional Call of Duty leagues and tournaments that would have provided Abner additional opportunities to earn "on field" income in the form of prize purses.  Prior to Activision's elimination of competition, there were far more professional Call of Duty leagues and tournaments

COMPLAINT

that provided significant prize purses. As one of the top professional Call of Duty players in the world—and arguably *the* top player—Abner would have earned significant income from these leagues and tournaments, if they had existed.

## **FIRST CAUSE OF ACTION**

### **(15 U.S.C. § 15(a), for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

### **(Rodriguez v. Activision)**

100.    Plaintiffs repeat, reallege, and incorporate by reference their allegations in Paragraphs 1 through 99 as if fully set forth herein.

101.    Activision and the Admitted Teams explicitly agreed that Activision held the exclusive right to grant or withhold consent to the sale or transfer of any Admitted Teams' participation rights in the Activision CoD League.

102.    Activision invoked that agreement to withhold consent to the sale of the Los Angeles franchise spot to Rodriguez without any procompetitive justification.

103.    The exclusion of Rodriguez, as an individual team owner, from the Activision CoD League and Activision's coercive threats that forced Rodriguez to partner with Envy Gaming constitute unlawful restraints of trade, whether treated as *per se* violations of Section 1 of the Sherman Act or analyzed under the rule of reason.

104.    As a direct and proximate result of Defendant's unlawful conduct alleged in this Complaint, Rodriguez has been injured in his business and property in an amount to be determined at trial but believed to be more than $100 million.

105.    Unless restrained by an order of this Court, Defendant will continue to violate Section 1 of the Sherman Act.

106.    As a direct and proximate result of Defendant's continued conduct alleged in this Complaint, Rodriguez is threatened with additional loss or damage to his business and property for which monetary compensation alone is not an adequate remedy.

- 32 -

COMPLAINT

107.    As a direct and proximate result of Defendant's unlawful conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

108.    Rodriguez is entitled to damages in an amount to be proven at trial, but exceeding $100,000,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

109.    Rodriguez is entitled to an injunction permanently prohibiting Defendant's ongoing violations alleged in this Complaint.

## SECOND CAUSE OF ACTION

**(15 U.S.C. § 15(a), for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

**(Abner v. Activision)**

110.    Plaintiffs repeat, reallege, and incorporate by reference their allegations in Paragraphs 1 through 99 as if fully set forth herein.

111.    Activision and the Admitted Teams explicitly agreed to suppress players' wages within the Activision CoD League, which Activision enforced through a Competitive Balance Tax.

112.    Activision and the Admitted Teams explicitly agreed to prevent players from competing with Activision or the Admitted Teams for sponsorship, advertising, and streaming revenue.

113.    The foregoing agreements are unlawful restraints on trade, whether treated as *per se* violations of Section 1 of the Sherman Act or analyzed under the rule of reason.

114.    As a direct and proximate result of Defendant's unlawful conduct alleged in this Complaint, Abner has been injured in his business and property in an amount to be determined at trial but believed to be more than $20 million.

115.    Unless restrained by an order of this Court, Defendant will continue to violate Section 1 of the Sherman Act.

116.    As a direct and proximate result of Defendant's continued conduct alleged in this Complaint, Abner is threatened with additional loss or damage to his business and property for which monetary compensation alone is not an adequate remedy.

117.    As a direct and proximate result of Defendant's unlawful conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

118.    Abner is entitled to damages in an amount to be proven at trial, but exceeding $20,000,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

119.    Abner is entitled to an injunction permanently prohibiting Defendant's ongoing violations alleged in this Complaint.

**<u>THIRD CAUSE OF ACTION</u>**

**(15 U.S.C. § 15(a), for Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

**(Rodriguez and HECZ, LLC v. Activision)**

120.    Plaintiffs repeat, reallege, and incorporate by reference their allegations in Paragraphs 1 through 99 as if fully set forth herein.

121.    Through a series of anti-competitive conduct, Defendant acquired and took concrete steps to willfully acquire and maintain an unlawful monopoly over the professional Call of Duty competition market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

122.    Through its unlawful conduct, Defendant willfully acquired and maintained a 100% monopoly in the relevant market.

123.    Defendant has exploited its unlawful monopoly for the financial benefit of the Defendant and to the financial detriment of Rodriguez and HECZ, LLC.

124.    As a direct and proximate result of Defendant's illegal conduct alleged in this Complaint, Rodriguez and HECZ, LLC have been injured in his business and property in an amount to be determined at trial but believed to be more than $100 million.

COMPLAINT

125.    Unless restrained by an order of this Court, Defendant will continue to monopolize the relevant market in violation of Section 2 of the Sherman Act.

126.    As a direct and proximate result of Defendant's continued threatened conduct alleged in this Complaint, Rodriguez and HECZ, LLC is threatened with additional loss or damage to his business and property for which monetary compensation alone is not an adequate remedy.

127.    As a direct and proximate result of Defendant's illegal conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

128.    Rodriguez and HECZ, LLC are entitled to damages in an amount to be proven at trial, but exceeding $100,00,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

129.    Rodriguez and HECZ, LLC is entitled to an injunction permanently terminating Defendant's ongoing violations alleged in this Complaint.

## FOURTH CAUSE OF ACTION

### (15 U.S.C. § 15(a), for Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

### (Abner v. Activision)

130.    Plaintiffs repeat, reallege, and incorporate by reference their allegations in Paragraphs 1 through 99 as if fully set forth herein.

131.    Through a course of anti-competitive conduct, Defendant acquired and took concrete steps to willfully acquire and maintain an unlawful monopoly over the professional Call of Duty competition market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

132.    Through its unlawful conduct, Defendant willfully acquired and maintained a 100% monopoly in the relevant market.

133.    Defendant has exploited its unlawful monopoly for the financial benefit of the Defendant and to the financial detriment of Abner.

134. As a direct and proximate result of Defendant's illegal conduct alleged in this Complaint, Abner has been injured in his business and property in an amount to be determined at trial but believed to be more than $20 million.

135. Unless restrained by an order of this Court, Defendant will continue to monopolize the relevant market in violation of Section 2 of the Sherman Act.

136. As a direct and proximate result of Defendant's continued threatened conduct alleged in this Complaint, Abner is threatened with additional loss or damage to his business and property for which monetary compensation alone is not an adequate remedy.

137. As a direct and proximate result of Defendant's illegal conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

138. Abner is entitled to damages in an amount to be proven at trial, but exceeding $20,00,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

139. Abner is entitled to an injunction permanently terminating Defendant's ongoing violations alleged in this Complaint.

**FIFTH CAUSE OF ACTION**

**(For Violation of the Cartwright Act, Bus. & Prof. Code § 16720)**

**(Rodriguez v. Activision)**

140. Plaintiffs repeat, reallege and incorporate by reference its allegations in Paragraphs 1 through 99 as if fully set forth herein.

141. Defendant and the Admitted Teams entered into and engaged in a continuing unlawful trust for the purpose of unreasonably restraining trade in violation of California Business and Professional Code section 16720.

142. Defendant and the Admitted Teams violated California Business and Professional Code section 16720 by forming a continuing unlawful trust and arranging a concerted action among

1   Defendants and their co-conspirators in order to restrain the resale of participation rights in the
2   Activision CoD League.

3         143.    In furtherance of the goals of the conspiracy, Defendant and the Admitted Teams
4   agreed that Activision had the exclusive right to grant or withhold consent to the sale of any
5   participation rights without any procompetitive justification.

6         144.    The combination and conspiracy alleged herein has had, inter alia, the following
7   effects:

8             a.   price competition in the sale of participation rights in the Activision CoD League has
9                  been restrained, suppressed, and/or eliminated in the State of California;

10            b.   prices for participation rights in the Activision CoD League sold by the Admitted
11                 Teams and approved of by Defendant have been fixed, raised, maintained, and
12                 stabilized at artificially high and non-competitive levels in the State of California;

13            c.   individual team owners, including Rodriguez, were required to partner with
14                 Activision-approved corporate partners; and

15            d.   team owners, including Rodriguez, were deprived of the benefit of free and open
16                 competition.

17        145.    As a direct and proximate result of Defendant's and its co-conspirators' unlawful
18  conduct, Rodriguez was injured in his business and property because he was forced to partner with
19  Envy Gaming to satisfy the fixed price and partnership requirements set by Activision (and
20  consented to by the Admitted Teams), which he would not have had to do but for Defendant's (and
21  its co-conspirators') unlawful conduct.

22        146.    As a result of Defendant's and its co-conspirators' violation of section 16720 of the
23  California Business and Professions Code, Rodriguez bring this claim pursuant to section 16750(c)
24  and seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to
25  section 16750(a) of the California Business and Professions Code.

26

27

28

**SIXTH CAUSE OF ACTION**

**(For Violation of the Cartwright Act, Bus. & Prof. Code § 16720)**

**(Abner v. Activision)**

147.    Plaintiffs repeat, reallege and incorporate by reference its allegations in Paragraphs 1 through 99 as if fully set forth herein.

148.    Defendant and the Admitted Teams entered into and engaged in a continuing unlawful trust for the purpose of unreasonably restraining trade in violation of California Business and Professional Code section 16720.

149.    Defendant and the Admitted Teams violated California Business and Professional Code section 16720 by forming a continuing unlawful trust and arranging a concerted action among Defendants and their co-conspirators in order to suppress competition for players in the professional Call of Duty market.

150.    In furtherance of the goals of the conspiracy, Defendant and the Admitted Teams agreed to set the price for professional players and enforce that agreement through a Competitive Balance Tax.

151.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a.   competition for professional players has been restrained, suppressed, and/or eliminated in the State of California;

    b.   wages paid to professional players has been suppressed below competitive levels;

    c.   teams and players were deprived of the benefit of free and open competition.

152.    As a direct and proximate result of Defendant's and its co-conspirators' unlawful conduct, Abner was injured in his business and property because his wages were capped by the Competitive Balance Tax, which would not have existed but for Defendant's (and its co-conspirators') unlawful conduct.

153.    As a result of Defendant's and its co-conspirators' violation of section 16720 of the California Business and Professions Code, Abner brings this claim pursuant to section 16750(c) and

1  seek treble damages and the costs of suit, including reasonable attorneys'' fees, pursuant to section

2  16750(a) of the California Business and Professions Code.

3  **SEVENTH CAUSE OF ACTION**

4  **(For Violation of California Unfair Competition Law, Bus. & Prof. Code § 17200 et seq.)**

5  **(Rodriguez, Abner, and HECZ, LLC v. Activision)**

6  154.  Plaintiffs repeat, reallege and incorporate by reference its allegations in Paragraphs

7  1 through 99 as if fully set forth herein.

8  155.  The conduct alleged herein constitutes unlawful and unfair business acts and

9  practices within the meaning of the California Unfair Competition Law, § 17200 *et seq*. of the

10  California Business and Professions Code ("UCL").

11  156.  Plaintiffs have suffered injury in fact and lost money or property as a result of

12  Defendant's violations of law and wrongful conduct. Such injuries and losses include, but are not

13  limited to, those injuries set forth in paragraphs 82 through 99 of this Complaint.

14  157.  Defendant's actions are unlawful under the UCL because they violate the Sherman

15  Antitrust Act.

16  158.  Defendant's actions are unfair under the UCL because Activision has exploited its

17  monopoly power to substantially lessen competition in the relevant market, thus preventing

18  consumers from choosing which professional CoD competition to do business within the relevant

19  product markets based on the merits of each company's products. Such conduct is immoral,

20  unethical, oppressive and/or unscrupulous and causes injury to consumers. Moreover, there is no

21  legitimate business justification for Defendant's conduct, and any business justification adduced is

22  outweighed by the harm Defendant's conduct has caused to consumers and competitors.

23  159.  Accordingly, Defendant have violated the UCL by engaging in unlawful and unfair

24  business practices.

25  160.  As a result of this unlawful and unfair conduct, Defendant has been unjustly enriched

26  at the expense of Plaintiffs and the general public.

27

28

COMPLAINT

161.    Plaintiffs seek an order of this Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under Section 17200 *et seq.*

**EIGHTH CAUSE OF ACTION**

**(For Violation of Section 3(2) of the Illinois Antitrust Act, 740 ILCS 10/3(2))**

**(Rodriguez v. Activision)**

162.    Plaintiffs repeat, reallege and incorporate by reference its allegations in Paragraphs 1 through 99 as if fully set forth herein.

163.    Defendant and the Admitted Teams entered into contracts and/or a conspiracy with each other for the purpose and with the effect of unreasonably restraining competition in the relevant market for professional Call of Duty competitions in a way that violates Section 3(2) of the Illinois Antitrust Act.

164.    Activision and the Admitted Teams explicitly agreed that Activision held the exclusive right to grant or withhold consent to the sale or transfer of any Admitted Teams' participation rights in the Activision CoD League.

165.    Activision invoked that agreement to withhold consent to the sale of the Los Angeles franchise spot to Rodriguez without any procompetitive justification.

166.    As a direct and proximate result of Defendant's unlawful conduct alleged in this Complaint, Rodriguez has been injured in his business and property in an amount to be determined at trial but believed to be more than $100 million.

167.    Unless restrained by an order of this Court, Defendant will continue to violate Section 3(2) of the Illinois Antitrust Act.

168.    As a direct and proximate result of Defendant's continued conduct alleged in this Complaint, Rodriguez is threatened with additional loss or damage to his business and property for which monetary compensation alone is not an adequate remedy.

169.    As a direct and proximate result of Defendant's unlawful conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

170.     Rodriguez is entitled to damages in an amount to be proven at trial, but exceeding $100,000,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

171.     Rodriguez is entitled to an injunction permanently prohibiting Defendant's ongoing violations alleged in this Complaint.

## NINTH CAUSE OF ACTION

**(For Violation of Section 3(3) of the Illinois Antitrust Act, 740 ILCS 10/3(3))**

**(Rodriguez v. Activision)**

172.     Through a series of anti-competitive conduct, Defendant acquired and took concrete steps to willfully acquire and maintain an unlawful monopoly over the professional Call of Duty competition market in a way that violates Section 3(3) of the Illinois Antitrust Act.

173.     Through its unlawful conduct, Defendant willfully acquired and maintained a 100% monopoly in the relevant market.

174.     Defendant has exploited its unlawful monopoly for the financial benefit of the Defendant and to the financial detriment of Rodriguez.

175.     As a direct and proximate result of Defendant's illegal conduct alleged in this Complaint, Rodriguez has been injured in his business and property in an amount to be determined at trial but believed to be more than $100 million.

176.     Unless restrained by an order of this Court, Defendant will continue to monopolize the relevant market in violation of Section 3(3) of the Illinois Antitrust Act.

177.     As a direct and proximate result of Defendant's continued threatened conduct alleged in this Complaint, Rodriguez is threatened with additional loss or damage to his business and property for which monetary compensation alone is not an adequate remedy.

178.     As a direct and proximate result of Defendant's illegal conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

COMPLAINT

179.    Because Defendant has violated Section 3(3) of the Illinois Antitrust Act through willful acts, Rodriguez is entitled to damages in an amount to be proven at trial, but exceeding $100,00,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

180.    Rodriguez is entitled to an injunction permanently terminating Defendant's ongoing violations alleged in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a judgment be entered against Defendant which:

(a)    On each and every Cause of Action, adjudicates and decrees that Defendant's conduct alleged herein violates the laws alleged in this Complaint;

(b)    On the First Cause of Action, awards Rodriguez threefold his damages in an amount to be proved, but believed to be more than $100 million, plus attorneys' fees, costs of suit, and post-judgment interest; and issue a permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act.

(c)    On the Second Cause of Action, awards Abner threefold his damages in an amount to be proved, but believed to be more than $20 million, plus attorneys' fees, costs of suit, and post-judgment interest; and issue a permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act.

(d)    On the Third Cause of Action, awards Rodriguez threefold his damages in an amount to be proved, but believed to be more than $100 million, plus attorneys' fees and costs of suit, and a permanent injunction enjoining Defendant from continuing to violate Section 2 of the Sherman Act;

(e)    On the Fourth Cause of Action, awards Abner threefold his damages in an amount to be proved, but believed to be more than $20 million, plus attorneys' fees, costs of suit, and post-judgment interest; and issue a permanent injunction enjoining Defendant from continuing to violate Section 2 of the Sherman Act.

(f)    On the Fifth Cause of Action, awards Rodriguez threefold his damages in an amount to be proved, but believed to be more than $100 million, plus attorneys' fees and costs of suit, and a permanent injunction enjoining Defendant from continuing to violate the Cartwright Act.

(g)    On the Sixth Cause of Action, awards Abner threefold his damages in an amount to be proved, but believed to be more than $20 million, plus attorneys' fees, costs of suit, and post-judgment interest; and issue a permanent injunction enjoining Defendant from continuing to violate the Cartwright Act.

(h)    On the Seventh Cause of Action, awards Plaintiffs all appropriate restitutionary relief in an amount to be proved, but believed to be more than $120 million, as well as a permanent injunction enjoining Defendant from continuing to violate the UCL;

(i)    On the Eighth Cause of Action, awards Rodriguez threefold his damages in an amount to be proved, but believed to be more than $100 million, plus attorneys' fees and costs of suit, and a permanent injunction enjoining Defendant from continuing to violate Section 3(2) of the Illinois Antitrust Act.

(j)    On the Ninth Cause of Action, awards Rodriguez threefold his damages in an amount to be proved, but believed to be more than $100 million, plus attorneys' fees and costs of suit, and a permanent injunction enjoining Defendant from continuing to violate Section 3(3) of the Illinois Antitrust Act.

(k)    On each cause of action, pre-judgment interest to the extent permitted by law;

(l)    Grants Plaintiffs such further relief as the case may require any Court may deem just and proper under the circumstances.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury of all issues so triable under law.

COMPLAINT

1    Dated: February 15, 2024

2                                          */s/ Eric S. Rosen*
                                           Eric S. Rosen (*pro hac vice forthcoming*)
3                                          Constantine P. Economides (*pro hac vice
                                           forthcoming*)
4                                          Brianna K. Pierce (CBN 336906)
                                           **DYNAMIS LLP**
5                                          100 Bayview Circle
                                           Newport Beach, CA 92660
6                                          Email: erosen@dynamisllp.com
                                                   ceconomides@dynamisllp.com
7                                                  bpierce@dynamisllp.com

8                                          Aaron M. Katz (*pro hac vice forthcoming*)
                                           **Aaron Katz Law LLC**
9                                          399 Boylston Street, 6th Floor
                                           Boston, MA 02116
10                                         Tel: (617) 915-6350
                                           Email: akatz@aaronkatzlaw.com

11                                         *Attorney for Plaintiffs*

12

13          .

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                  - 44 -
                                 COMPLAINT